UNITED STATES

v.

Orison S. ACEVEDO, Fireman (E–3), U.S. Coast Guard.

UNITED STATES

v.

Scott L. GILBERT, Machinery Technician Third Class, U.S. Coast Guard.

CGCMG 0114. Docket No. 1066.
CGCMG 0115. Docket No. 1067.

U.S. Coast Guard Court of Criminal Appeals.

30 June 1997.

Trial Counsel: LT Benes Z. Aldana, USCGR.

Detailed Defense Counsel in *Acevedo*: LT Michael R. Maule.

Detailed Defense Counsel in *Gilbert*: LT Wise D. Allen, JAGC, USNR.

Appellate Defense Counsel: LT Richard R. Beyer, USCGR.

Appellate Government Counsel: LT Frank R. Levi, USCGR.

Before BAUM, FEARNOW, O'HARA and WESTON, Appellate Military Judges.

OPINION OF THE COURT *EN BANC*

WESTON, Judge:

These two related cases arise from the theft of property belonging to the U.S. Coast Guard, some of which was pawned for cash. Both Appellant Acevedo and Appellant Gilbert were convicted according to their pleas, pursuant to pretrial agreements, at separate

general courts-martial comprised of a military judge alone.

Appellant Acevedo was found guilty of violating Articles 80, 81, 108, 121, and 134 of the UCMJ and was sentenced to confinement for 30 months, reduction from grade E–3 to E–1, forfeiture of all pay and allowances, and a bad conduct discharge. The convening authority approved the sentence, except that confinement in excess of 15 months was suspended for 12 months, as required by a pretrial agreement.

Appellant Gilbert was found guilty of violating Articles 80, 81, 108, and 121 of the UCMJ and was sentenced to confinement for 12 months, reduction from grade E–4 to E–2, forfeiture of all pay and allowances for 12 months, and a bad conduct discharge. The convening authority approved the sentence, except that confinement in excess of six months was suspended for 12 months and forfeitures exceeding two-thirds pay per month for six months was suspended for 12 months, as required by a pretrial agreement.

Appellant Acevedo initially assigned as error the convening authority's failure to indicate in the record that he had considered the submitted clemency matters before taking action. Appellant Gilbert initially assigned as error the failure of the military judge to consolidate the specification of Charge I (Article 80) and a specification of Charge III (Article 108) after ruling the former to be a lesser included offense of the latter Charge. Both appellants also claimed that this Court lacks jurisdiction due to the service of a civilian judge not appointed in accordance with the Appointments Clause of the U.S. Constitution. Article II, § 2, cl. 2. This latter claim of error was conclusively resolved by *Edmond v. U.S.*, —— U.S. ——, 117 S.Ct. 1573, 137 L.Ed.2d 917, 65 U.S.L.W. 4362 (1997), and it is accordingly rejected without further discussion. Lastly, at the behest of this Court, both appellants submitted supplemental briefs in which they claimed the military judge did not adequately inquire into the appellants' understanding of the meaning of the sentence limitations in their pretrial agreements. They also argued that those agreements require the suspension of the bad conduct discharges.

At the request of both appellants and the Government, these cases were consolidated for purposes of oral argument on the common issues relating to sentence and were heard by the Court sitting *en banc*. In view of these common issues that were heard at one time for both cases, the records have been considered together for decision and disposition. Any motions not previously acted upon in these two cases are hereby granted.

## I.

### THE FACTS

Both appellants entered into pretrial agreements. Appellant Acevedo admitted committing multiple thefts over a period of several years. In 1995 he and another Coast Guardsman induced Appellant Gilbert to steal property from his ship in order to pawn that property for money. The property stolen by Appellant Gilbert—survival suits and cold weather clothing—had a value in excess of $2,000.00. The property stolen by Appellant Acevedo—hand tools, survival suits, cold weather clothing, signal flags, and other miscellaneous items—had a value in excess of $6,000.00. The Pacific Area Commander referred the charges against both appellants to general courts-martial on 23 January 1996. Appellants' trials were separately held before a military judge alone, who convicted each according to their pleas.

In each case, during the plea providence inquiry the military judge instructed the appellants to reread the sentence limitation portion of the agreement while she described the general features typical of such agreements. Without disclosing the contents of the sentence limitation, each appellant stated that he understood the limits set forth in his agreement. In the case of Appellant Acevedo, the record indicates that he conferred with defense counsel before responding that he understood the sentence limitation provisions.

In the case of Appellant Gilbert, the military judge ruled that the specified violation of Article 80 (attempt) was, at least in part, multiplicious with the charged violation of Article 108. However, two of the items

which were listed under the charged attempt to pawn stolen property for cash were not included in the corresponding violation of Article 108. The military judge adjusted the maximum allowable punishment downward, but let stand the findings of guilty on both specifications.

Appellants' pretrial agreements contained identical sentence limitations regarding punitive discharge. The relevant sections in each agreement state:

"Maximum sentence to be approved by convening authority:

1. *Punitive Discharge*

A punitive discharge may be approved as adjudged. If adjudged and approved, a dishonorable discharge will be suspended for a period of 12 months from the date of court martial at which time, unless sooner vacated, the dishonorable discharge will be remitted without further action.

2. *Confinement or Restraint*

Confinement may be approved as adjudged, . . . ."

Appellate Exhibit VI (Acevedo); Appellate Exhibit II (Gilbert).

The appellants were each sentenced to a bad conduct discharge in addition to the other punishments noted above. In each case, after announcing the sentence the military judge reviewed the sentence limitation portion of the pretrial agreements. The military judge clearly did not consider the identical sentence limitations regarding punitive discharge in these two agreements to have any effect on the bad conduct discharges adjudged. Although the colloquy was slightly different in each case, each appellant implicitly agreed with that understanding as well. When the military judge summarized the impact of the sentence limitations in each case, she notably omitted any mention of an effect on the bad conduct discharge just announced. The military judge then asked the appellants whether she had correctly stated the effect of the sentence limitation in their pretrial agreements. Each appellant stated that she *had* correctly described the effect on the sentence. In the case of Appellant Acevedo, the military judge also specifically noted that the provision in the pretrial agreement

suspending a dishonorable discharge did not mention a bad conduct discharge and that the bad conduct discharge was therefore *not* suspended. Although the military judge did not ask Appellant Acevedo to confirm his agreement with that understanding, both trial counsel and defense counsel stated their agreement with that conclusion.

In the case of Appellant Acevedo, the convening authority did not make any notation on the clemency materials submitted by defense counsel to indicate when or whether he considered those materials. However, in an affidavit, the staff judge advocate stated that he submitted both his RCM 1106 advice and the clemency materials in a single folder, in accordance with his standard practice at the time. Paragraph 3. of the staff judge advocate's RCM 1106 advice to the convening authority states " . . . Before taking action you must consider: . . . c. Any matters which FN Acevedo may submit under Rules for Courts–Martial 1105 or 1106 . . . ." Staff Judge Advocate's Recommendation Under Rule for Courts–Martial 1106, (Apr. 5, 1997). Later in the same memorandum, the convening authority was further advised:

"11. Under R.C.M. 1106(f)(5), defense counsel has ten days from the date of receipt of this recommendation to submit comments to you. As convening authority, you should not take action until this ten day period has passed and you have considered any comments submitted. I will notify you of the date upon which you may take your action." *Id.*

Following their trials, neither appellant asserted that the sentence limitation provision in the pretrial agreements required the suspension of the bad conduct discharge. In their clemency petitions, each appellant sought the suspension of his bad conduct discharge, but as a matter of leniency within the discretion of the convening authority. Neither appellant asserted then that the convening authority was required to suspend a bad conduct discharge. Similarly, in their initial filings before this Court neither appellant identified the failure of the convening authority to suspend the bad conduct discharge as contrary to the terms of the pretrial agreement. It was only after this Court

drew attention to the ambiguity in the pretrial agreement and sought briefing on the meaning of the sentence limitation provision that each appellant claimed suspension of a bad conduct discharge was required by these agreements.

## II.

### INTENT OF THE PARTIES TO THE PRETRIAL AGREEMENTS

■ In these two cases, the pretrial agreements contained identical sentence limitations on punitive discharge, the meaning of which are susceptible to differing interpretations. The appellants now argue that because a dishonorable discharge must be suspended under these pretrial agreements,[1] a suspended dishonorable discharge represents the maximum punitive discharge that can be approved by the convening authority. Under the appellants' rationale, this result is required because an unsuspended bad conduct discharge is more severe than a suspended dishonorable discharge and the sentence limitation requiring the suspension of a dishonorable discharge operates as a ceiling for all punitive discharges. Alternatively, appellants argue that since the pretrial agreement did not use the term "bad conduct discharge" when describing what the convening authority could approve, and because the appellants were not specifically asked if they thought an unsuspended bad conduct discharge could be imposed, it is unfair to approve a bad conduct discharge. The appellants also argue that we should find the military judge's inquiry into the providence of the pleas deficient for failing to fully explore the accused's understanding of this latent ambiguity in the pretrial agreements.

While conceding that it is indeed possible to ascribe to these pretrial agreements the meaning appellants now advance, we do not think that interpretation is consistent with the most natural reading of the relevant language in these agreements. Moreover, as more fully discussed below, we are persuaded by the record in these two cases that none of the parties—including the military judge—believed these agreements foreclosed the imposition of an unsuspended bad conduct discharge. Under these circumstances, the fact that the military judge did not seek a detailed explanation of the appellants' understanding of a seemingly inapplicable provision in the pretrial agreements in no way detracts from the providence of their pleas. The military judge's inquiry before the entry of pleas and after sentencing was sufficiently detailed to satisfy us that these appellants entered these agreements voluntarily and with the same understanding of their pretrial agreements as that shared by the convening authority, their counsel, and the military judge. The fact that the ambiguity in these pretrial agreements was not detected until long after trial, and only then after being raised by this Court, strongly suggests that we should attempt to effectuate that common understanding. This Court has stated that, ". . . the mutual understanding of the parties, if it can be ascertained, should be determinative of the question." *U.S. v. Llewellyn,* 27 M.J. 825, 826 (CGCMR 1989).

Although these agreements are not models of clarity, it seems abundantly clear from the record in each of these two cases, that all of the parties were of the understanding that a bad conduct discharge could be approved and executed, if adjudged. Each appellant told the military judge during the plea inquiry that he understood his pretrial agreement and that he entered it freely and voluntarily. In each case, immediately following the announcement of sentence the military judge reviewed the sentence limitations contained in the pretrial agreement and stated her understanding of its effect on the sentence. She did *not* mention any effect on the bad conduct discharge just adjudged—and each appellant stated on the record that she had correctly described the effect of their agreement on the sentence.[2] In the case of Appel-

---

1. Appellate government counsel's brief concedes that if a dishonorable discharge had been adjudged in either of these cases, the language in the pretrial agreement would have foreclosed anything other than suspension of that discharge.

Supplemental Reply Brief for Government (Dec. 2, 1996), p. 4.

2. "MJ: Petty Officer Gilbert, does it seem to you that, that's the effect?
  ACC: Yes, ma'am." Gilbert R. 92.

lant Acevedo, the military judge also noted on the record that the limitation on a dishonorable discharge was not applicable to the bad conduct discharge just adjudged—and obtained the concurrence of counsel in that conclusion.[3] Rather than infer such a limitation indirectly, we choose to apply what we believe is the most reasonable interpretation of those agreements.

The language of the pretrial agreements themselves is consistent with the common understanding of these parties that an unsuspended bad conduct discharge could be imposed. The paragraph specifically dealing with punitive discharges does not limit the approval or execution of a bad conduct discharge. To the contrary, the first sentence states that all punitive discharges may be approved. Standing alone, this term would allow the convening authority to approve without suspension either a bad conduct discharge or a dishonorable discharge, if adjudged. The next sentence in the paragraph limits the one preceding it by requiring a dishonorable discharge, if approved, to be suspended.[4] This limit on the range of action available to the convening authority did not, on its face, impair his ability to approve without suspending a bad conduct discharge.

The statements on the record by the appellants and their counsel convince us that this interpretation reflects their understanding of the meaning of their respective pretrial agreements with respect to a bad conduct discharge. Furthermore, as was the case in *Llewellyn*, the actions of appellants, and of defense counsel at both the trial and appellate levels, belie any claim of a contrary understanding. In their petitions for clemency to the convening authority and then,

again, in their initial claims of error to this Court, appellants did not assert an understanding that the pretrial agreements required the suspension of a bad conduct discharge. In short, we are convinced beyond a reasonable doubt that each of the appellants justifiably sought to protect himself against the imposition of a dishonorable discharge[5] and, in exchange for that guarantee together with the other limits on sentence, each was willing to accept a bad conduct discharge, if adjudged.

Accordingly, we find that the parties to these pretrial agreements did not intend to bar the approval of an unsuspended bad conduct discharge. The explicit terms of these two agreements allow for the approval of a punitive discharge generally and then go on to only limit the action that can be taken with respect to a dishonorable discharge (if approved). To require that the adjudged bad conduct discharges in these cases be suspended based on an inference raised by the limit on a dishonorable discharge would constitute an unjust windfall to these appellants. We see no reason to retroactively revise the bargains to which these parties freely and voluntarily agreed. *See U.S. v. Rivera*, 46 M.J. 52, 55 (1997).

## III.

### CONSOLIDATION OF CHARGES

[2] Appellant Gilbert further claims that the failure of the military judge to consolidate the specification under Charge I (attempt) with the corresponding specification 2 under Charge III (unauthorized conversion of property) was error. The military judge

---

"MJ: Fireman Acevedo, do you agree that I've correctly stated the limitation on the sentence? ACC: Yes—yes, Your Honor." Acevedo R. 96.

3. "MJ: Okay, I do notice that it's—it talks about suspending a dishonorable discharge but there's nothing about doing anything to a bad conduct discharge so that is not suspended. Right?

TC: That is correct, Your Honor.
DC: Yes, Your Honor." Acevedo R. 96–97.

4. We do not address whether the convening authority would have violated the pretrial agreement if instead of approving a dishonorable discharge he had sought to change it to another

form of punishment. However, as noted in f.n. 1, the Government apparently concedes that if a dishonorable discharge had been adjudged, these agreements would have precluded any action other than suspension.

5. With respect to the dishonorable discharge provision, the pretrial agreements were inartfully drafted to require the *suspension* of a dishonorable discharge instead of its *commutation to a bad conduct discharge*, as seems most likely to have been intended. However, we need not address the failure of the agreement to accomplish that aim, since a dishonorable discharge was not adjudged.

found the two offenses multiplicious for sentencing and adjusted the total punishment allowable downwards. Appellant Gilbert raised no objection at trial, but now contends that the separate findings of guilty should not be allowed to stand.

As the military judge noted, the applicable specifications of the two charges are not completely congruent. There were additional items covered by the charged attempt which were not included in the charged conversion of property. To the extent that these additional items were the subject only of the attempted conversion, the specification of Charge I is not multiplicious for findings. RCM 1003(c)(1)(C). However, the Government now concedes that those property items of Charge I that are also mentioned in specification 2 of Charge III, should be set aside. Reply Brief for Government (Sept. 26, 1996), p. 4.

Since no objection was raised at trial, and since the military judge considered the two specifications multiplicious for sentencing, any error in failing to merge a portion of the specification of Charge I into specification 2 of Charge III was harmless. Nonetheless, we agree that the findings should be adjusted to reflect that merger.

## IV.

## MATERIALS CONSIDERED BEFORE CONVENING AUTHORITY ACTION

■ Appellant Acevedo cites as error the absence of indicia in the record that the convening authority considered his petition for clemency before taking action. Government appellate counsel urges that a presumption of regularity should pertain concerning the manner in which the convening authority acted, absent some showing to the contrary. Although the clemency petition in the record does not have the convening authority's initials or otherwise reflect that it was, in fact, considered before the convening authority acted, there is also no evidence suggesting the convening authority failed to consider the material before acting. Buttressing a conclusion of propriety concerning the convening authority's action in this case

is an affidavit from the staff judge advocate which states that the clemency petition was submitted in a single folder to the convening authority together with the RCM 1106 advice. *See also U.S. v. Garcia*, 44 M.J. 748 (C.G.Ct.Crim.App.1996). We are convinced that the convening authority did, in fact, consider the clemency petition prior to taking action on Appellant Acevedo's court-martial. The assignment of error is rejected for that reason.

## V.

## SUMMARY

Our Court is evenly divided on the question of whether the bad conduct discharges adjudged and approved in these cases should be upheld. Although we believe Chief Judge Baum and Judge O'Hara's determinations involve mixed questions of fact and law, we construe our ultimate differences to be over the legal sufficiency of the plea providence inquiry of the military judge and the legal effect to be given the sentence limitations in the pretrial agreements in these cases. Since we believe the outcome of these cases turn on questions of law, our decision affirms these two cases. *U.S. v. Ohrt*, 28 M.J. 301 (CMA 1989). However, we heartily agree with Chief Judge Baum that it would be helpful to resolve the legal status of an evenly split vote of this Court on factual issues—a question left unaddressed by the *Ohrt* opinion.

We have reviewed the records in these two cases in accordance with Article 66, UCMJ. With respect to Appellant Acevedo we have determined the findings of guilty correct both in law and fact; however, the sentence, as approved and partially suspended below, must be modified to conform to the pretrial agreement's requirement that the period of suspension runs from the date of trial. Accordingly, the sentence action below, relating to the suspension of confinement, is modified to state that confinement exceeding 15 months shall be suspended for 12 months from the date of trial. The sentence, approved and partially suspended below, as modified, is affirmed.

With respect to Appellant Gilbert, excepting the following words in the specification of

Charge I: "one blue Mustang Aviation Coverall, Model MAC–10, of a value of about $451.97; one orange mustang Coverall, Model MAC–10, of a value of about $451.97; one orange wet suit, Life Saving Systems, Inc., Model 417, of a value of about $286.00; one red Ocean class Mustang jacket, Model MC1700, of a value of about $277.42;" and "five green extreme cold weather parkas, Model # N3–B, of a value of about $91.75 each," and "$2312.31", we have determined the findings of guilty correct both in law and fact. Of the excepted words in the specification of Charge I, we find Appellant Gilbert not guilty. The sentence, as approved and partially suspended below, must be modified to conform to the pretrial agreement's requirement that the period of suspension runs from the date of trial. The approved sentence must also be modified to conform with RCM 1003(b)(2), which requires a partial forfeiture of pay to be stated in whole dollars. Accordingly, the sentence action below, relating to the suspension of confinement, is modified to state that confinement exceeding six months is suspended for 12 months from the date of trial. The sentence action below, relating to the forfeiture of pay, is modified to state that the forfeiture of pay in excess of $673.00 per month for six months is suspended for 12 months from the date of trial. Appellant Gilbert's sentence, approved and partially suspended below, as modified, is affirmed.

Judge FEARNOW concurs.

BAUM, Chief Judge, with whom Judge O'HARA joins, concurring in part and dissenting in part.

I concur with all but the portions of Judge Weston's opinion dealing with the pretrial agreements and resultant sentence actions on the punitive discharges in each case. I dissent from those parts of the opinion. For me, the issue with respect to each sentence is simply one of requiring the Government to adhere to the plain wording of its written bargain with the accused, an obligation the convening authority failed to keep.

The pretrial agreement in each case required the convening authority to suspend for 12 months any adjudged and approved dishonorable discharge (DD). Under the terms of the agreement, that constituted the ceiling for punitive discharges, above which the convening authority could not go.[1] He could reduce this aspect of the sentence, but he could not increase its severity. The question for me then boils down to whether the less onerous bad conduct discharge (BCD), in an unsuspended state, is actually more severe than the harsher DD that had to be suspended in accordance with the explicit terms of the pretrial agreement.

From my viewpoint and Judge O'Hara's, an unsuspended punishment is necessarily more severe because, absent legal error or mitigating action by higher authority, it is certain to be executed and the accused will suffer its full impact. With a suspended sentence, that will not happen, if the accused adheres to the terms of probation. In that event, the accused will avoid the suspended punishment entirely. Accordingly, Judge O'Hara and I have concluded that an unsuspended BCD is a more severe punishment than a suspended DD and, therefore, exceeds the maximum sentence limitation of the pretrial agreement in each case.

Judge Weston and Judge Fearnow reach a contrary conclusion based on what they find

---

1. The first paragraph of the pretrial agreements which the convening authority approved and signed in each case, states that the accused agreed to plead guilty, "provided the sentence as approved by the convening authority will not exceed the sentence hereinafter indicated by me." (App. Exh. I in Gilbert and App. Exh. V in Acevedo.) That maximum sentence was set out in appendices (App. Exh. II in Gilbert and App. Exh. VI in Acevedo), which began with the statement: "Maximum sentence to be approved by the convening authority," followed by five parts relating to: (1) Punitive Discharge, (2) Confine-

ment or restraint, (3) Forfeitures and Fines, (4) Reduction in Rate, and (5) Other lawful punishments. The provision covering punitive discharges reads as follows:

1. *Punitive Discharge*
A punitive discharge may be approved as adjudged. If adjudged and approved, a dishonorable discharge will be suspended for a period of 12 months from the date of court martial at which time, unless sooner vacated, the dishonorable discharge will be remitted without further action.

as the intent of the parties. They do this **without a statement in the record of the accused's understanding of the punitive discharge provision** in either case. The judge did not explain how the DD could be suspended without, in turn, requiring suspension of a BCD, nor did she elicit from the accused in each case his understanding of what had been promised by the convening authority with regard to a punitive discharge. In the case of Fireman Acevedo, the judge, without explaining how suspension of one discharge could be reconciled with not suspending the other, observed in passing that the adjudged BCD was not affected by the pretrial agreement's discharge provision and obtained a concurrence from both counsel, but nothing from the accused. In the case of Petty Officer Gilbert, the judge said absolutely nothing at all to counsel or accused about the punitive discharge provision. Accordingly, the views of both accused on that particular sentence limitation are missing.[2]

Without those views, I cannot say what constituted the understandings of these two accuseds. Moreover, I do not believe we can fill this void by imputing to them the understandings of counsel, as divined from these records. It is difficult enough to discern exactly what these counsel understood with respect to adjudged discharges, but to know from the records what counsel explained to their clients concerning required discharge actions is literally impossible. If the accuseds, both of whom desired to avoid punitive discharges, had been told by counsel that the convening authority was bound to suspend any adjudged DD, but not necessarily required to do so with respect to a BCD, why were arguments to the judge not tailored to

seek a DD as part of the sentence? Was the failure of both counsel to make such a sentence argument the result of some misunderstanding as to pretrial agreement requirements? If so, then what did counsel and accused understand the convening authority's obligations to be under the pretrial agreement?[3] The records do not provide answers to these questions. Without them, Judge O'Hara and I see no basis at this stage for determining understandings of counsel and accuseds that differ from the plain wording of the agreement. We simply refuse to speculate on such matters at this point. One of the stated purposes of the procedure requiring judges to inquire into pretrial agreements and explain their meaning to each accused, as established by *U.S. v. Elmore,* 1 M.J. 262, 264 (CMA 1976), *U.S. v. Green,* 1 M.J. 453 (CMA 1976), and *U.S. v. King,* 3 M.J. 458 (CMA 1977), is to assure "on the record that an accused understands the meaning and effect of each condition as well as the sentence limitations imposed by any existing pretrial agreement." *U.S. v. King,* 3 M.J. 458 (quoting from *Elmore* at 264).

Judge Weston cites *U.S. v. Llewellyn,* 27 M.J. 825 (CGCMR 1989), to support his drawing conclusions concerning the understandings and intent of the parties that are not spelled out in the pretrial agreements or the records of trial. In *Llewellyn,* the pretrial agreement was very narrow with respect to sentence action, addressing a single limitation as to one form of punishment and silent as to other forms of punishment. That specific limitation was explained to both counsel and the accused, and their responses were received and documented on the record.

2. Judge Weston cites to each accused's concurrence with the trial judge's statement of the pretrial agreement's effect on the sentence as reflecting an understanding that a BCD could be approved and executed. See footnote 2 of the principal opinion and the paragraph to which it pertains. Judge O'Hara and I do not believe the quoted concurrences of each accused should be read as anything more than agreement with the plea bargain's impact on confinement in one case, and confinement and forfeitures in the other case, which is what the judge explained. Since the explanations did not deal ·at all with the punitive discharge provisions of the negotiated agreements and their effect on the sentence, we do not believe the responses of the accuseds

should be read as reflecting their understanding of the impact of those provisions.

3. Judge Weston indicates in his footnote 5 that he believes commutation of the DD rather than suspension was most likely intended. If that is so, it confirms my conclusion that it is impossible to know at this point what counsel understood and explained to each accused. There is nothing in the record reflecting a belief that commutation was intended. The judge's inquiry certainly did not develop that understanding and it flies in the face of the Government's concession that the DD was required to be suspended.

On review, that sentence provision was seen as arguably ambiguous and, in that situation, this Court believed that, if the ambiguity could be cleared up by ascertaining a mutual intent and understanding of the parties which did not conflict with their record responses, it should be determinative. The cases here are different in several important respects. In both cases before us, the pretrial agreements contain five distinct sentencing provisions. All of those provisions were not explained to the accused and counsel by the judge. Most importantly, an explanation of the punitive discharge provision is missing in its entirety in one case and only cursorily noted in the other. Moreover, as already indicated, neither accused was queried concerning his understanding and intent with respect to that punitive discharge provision. Given these factual differences, Judge O'Hara and I do not find *Llewellyn* to support drawing conclusions as to intent and understandings in these cases.

In light of the differing views at this level engendered by the common discharge provision's failure to expressly deal with a BCD and the judge's failure to address this matter directly with the accuseds, advice provided by this Court in *Llewellyn* bears repeating:

> For this reason, it is important for pretrial agreements to fully cover all contemplated actions in a manner that is clear to all concerned. Thereafter, it is incumbent upon trial judges, through inquiry of the accused, defense counsel and government counsel, to carefully establish understandings on the record. It is particularly important for judges, once a sentence has been imposed, to determine from the parties what action the agreement requires of the convening authority with respect to *that specific sentence*, and what other ac-

tions, if any, are permitted under the agreement.

*Id.* at 826.

I would add to that advice the following suggestion: that, after imposing sentence, a judge should examine and question the pretrial agreement's sentence requirements in the same manner that he or she would have done had those terms been viewed before sentencing. I believe that judges are possibly more apt to think of different ramifications before a sentence is known, than after. For example, if the instant cases had been tried with members and the judge had viewed the agreement in its entirety when making her inquiry before imposition of sentence, I believe that she would have had questions about the agreement's effect on a possible BCD and that she would have sought an explanation of that effect from counsel and accused. If that had been done, we might have answers from the accuseds that are missing from the records before us. Without those answers, Judge O'Hara and I view the steps taken in the principal opinion as a reforming of the plea bargain's written punitive discharge provision. A trial judge may take this sort of action, if everyone expresses on the record that they understand and agree to the unwritten or different terms.[4] We do not believe that such may be accomplished at this level without a clear agreement of all the parties.

Since Judge O'Hara and I find an unsuspended discharge to exceed the limits of the written terms of the pretrial agreement, we would carry out the action required of the convening authority by ordering the BCD in each case suspended for twelve months from the date of trial. Under no circumstances would we affirm an unsuspended BCD in the face of the plea bargain provision requiring

---

4. The discussion under RCM 910(f)(4) relating to the military judge's responsibility to ensure by inquiry that the accused understands the pretrial agreement and that the parties agree to the terms of the agreement, states: "If the plea agreement contains any unclear or ambiguous terms, the military judge should obtain clarification from the parties. If there is doubt about the accused's understanding of any terms in the agreement, the military judge should explain those terms to the accused." RCM 910(h)(3) relating to inquiry after sentence is announced, states: *"Pretrial*

*Agreement Inquiry.* After sentence is announced the military judge shall inquire into any parts of a pretrial agreement which were not previously examined by the military judge. If the military judge determines that the accused does not understand the material terms of the agreement, or that the parties disagree as to such terms, the military judge shall conform, with the consent of the Government, the agreement to the accused's understanding or permit the accused to withdraw the plea."

suspension of a DD, with no contrary understanding expressed by either accused on the record. It just does not make sense to us that a convening authority would be willing to suspend a DD, but not a BCD. We join in affirming the findings of guilty and the remainder of the sentences in both cases.

As a separate matter, it should be noted that there is no majority decision in either case with respect to the punitive discharge. Two judges would affirm the approved unsuspended BCD and two judges say that under the terms of the pretrial agreement it cannot be affirmed in an unsuspended state. In *U.S. v. Beckermann*, 25 M.J. 870, (CGCMR 1988), this Court expressed the view that findings and sentence could not be affirmed by anything less than a majority vote, given the unique responsibilities of the Court under Article 66. UCMJ and Rule 4 of the joint rules for the service appellate courts, which says: "The determination of any matter referred to the panel shall be according to the opinion of a majority of the judges participating in the decision." That interpretation was rejected by the then Court of Military Appeals in *U.S. v. Ohrt*, 28 M.J. 301 (CMA 1989), at least with respect to matters of law, holding that an evenly divided vote on a question of law will affirm. It left open the question whether evenly divided votes on questions of fact or appropriateness of sentence would lead to the same result.

I continue to believe that, without a change to the rules for our Courts of Criminal Appeals that provides specifically for the kind of action to be taken on evenly divided votes, the present Rule 4 with respect to majority votes should prevail. Nevertheless, until such time as the Court of Appeals for the Armed Forces should say otherwise, *U.S. v. Ohrt*, supra, must be followed. Further clarification of that decision with respect to findings of fact and mixed questions of law and fact is needed, however, since such determinations are at issue here. There is some indication in *Ohrt* that an evenly divided vote on mixed questions of law and fact requires an affirming decision. Accordingly, we agree that until further clarification of this subject is provided by the Court of Appeals for the Armed Forces, the sentences in both cases must be affirmed, despite the evenly divided vote on the action to be taken with respect to the punitive discharges.